**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE ASBURY AUTOMOTIVE GROUP, INC. DATA INCIDENT LITIGATION | **Lead Case No. 1:24-mi-55555-VMC**<br><br>**Class Action**<br><br>**Jury Demand** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Evan Miller, Omar Aviles, David Pedraza, Christian D. Scott, Stephen Johnson, and Brendan Siebels ("Plaintiffs"), individually and on behalf of all others similarly situated, complain and allege as follows against Defendant, Asbury Automotive Group, Inc. ("Defendant" or "Asbury") based on personal knowledge, on the investigation of their counsel, and on information and belief as to all other matters:

## I.    INTRODUCTION

1.    On or about December 23, 2023, Asbury, a corporation that owns 157 new vehicle dealerships across 15 states,[1] and at any given time has over 15,000 employees, lost control over its computer network and the Personally Identifying

---

[1] https://investors.asburyauto.com/about-us.

Information[2] ("PII") of Plaintiffs and the proposed Class Members in a data breach perpetrated by cybercriminals (the "Data Breach"). Based on Defendant's filings, the Breach affected thousands of individuals.[3]

2.    According to Defendant's data breach notification letter, Defendant discovered the Data Breach on or about December 25, 2023. Defendant's internal investigation revealed that an unauthorized third party accessed and acquired a number of files from Defendant's system.[4] Defendant's cybersecurity posture was so poor that it was unable to identify that malicious activity was in progress until the cyber gang had completed its task of stealing Plaintiffs' and Class Members' valuable information,[5] which strongly implies that Defendant's logging, monitoring, and alerting systems were insufficient as compared to industry standards and were incapable of identifying malicious activity.

3.    On information and belief, the information compromised in the Data Breach includes, but is not limited to, individuals' names, social security numbers,

---

[2] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[3] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed September 8, 2024).

[4] *See:* Asbury Notice of Data Breach to Plaintiff Miller, April 22, 2024, attached as **Exhibit A**; and Asbury sample Notice of Data Breach to Maine Attorney General,  available at https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/0dae7fdc-1086-4708-9e8c-a07294ed1ada/169401fd-b434-45e5-b3ef-00e4f56030c5/Asbury%20-%20Maine%20Attachment.pdf  (last accessed September 22, 2024).

[5] *Id.*

passport information, photos of driver's licenses, private financial information, employee data, and more.[6]

4.      On or around April 22, 2024, Defendant finally notified victims of the Data Breach,[7] stating:

> On December 25, 2023, we detected unauthorized access to files on some of our file servers. Immediately upon identifying the unauthorized activity, we implemented our incident response plan, took steps to contain the activity, and launched an investigation. A cybersecurity firm that has assisted other companies in similar situations was engaged and law enforcement was notified. The investigation identified that an unauthorized actor accessed certain systems in our network and, on December 25, 2023, acquired files stored on some of our file servers.

5.      Defendant's breach notice obfuscated the nature of the breach and the threat it posed—refusing to tell its victims how many people were impacted, how the breach happened, or why it took the Defendant four months to begin notifying its victims.

6.      Cybercriminals intentionally targeted Defendant for the highly sensitive Private Information it stores on its computer network, attacked and bypassed the insufficiently secured network, and exfiltrated the highly sensitive Private Information, including the Social Security numbers of victims. As a result,

---

[6] Hamza Tarq, *Fortune 500 Company Among the Latest Victims of the Cactus Ransomware Group* (Jan. 16, 2024), https://techlapse.com/news/asbury-automotive-hacked-by-ransomware-group.
[7] Exhibit A.

the Private Information of Plaintiffs and Class remains in the hands of those cyber-criminals.

7.      If Defendant had implemented and maintained reasonable, industry standard alerting systems like endpoint detection and response ("EDR"), extended detection and response ("XDR"), data loss prevention ("DLP"), and Security Information and Event Management ("SIEM"), Defendant likely would have recognized the malicious activity on its information systems in time to stop the attack before the hackers could steal Plaintiffs' and the proposed Class Members' highly sensitive Private Information.

8.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

9.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Private Information misuse.

10.     The exposed Private Information of Plaintiffs and Class Members can—and likely will—be sold on the dark web. Hackers can offer for sale the unencrypted, unredacted Private Information to criminals. Plaintiffs and Class

Members now face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers—the gold standard for identity thieves.

11.    Additionally, because of Defendant's delayed response, Plaintiffs and Class Members had no idea their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

12.    Plaintiffs bring this action on behalf of all persons whose Private Information was compromised because of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

13.    Plaintiffs and Class Members have suffered injury because of Defendant's conduct. These injuries include: (i) lost or diminished value of Private Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to

lost time, and (iv) the continued and substantially increased risk to their Private Information which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

14.    Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.    PARTIES

15.    Plaintiff Evan Miller is and has been, at all relevant times, a resident and citizen of Greenwood, Indiana. On or about April 22, 2024, Plaintiff Miller received the Notice Letter directly from Defendant.

16.     Plaintiff Omar Aviles is and has been, at all relevant times, a resident and citizen of Tucson, Arizona. On or about April 22, 2024, Plaintiff received the Notice Letter directly from Defendant.

17.     Plaintiff David Pedraza is and has been, at all relevant times, a resident and citizen of Atlanta, Georgia. On or about April 22, 2024, Plaintiff received the Notice Letter directly from Defendant.

18.     Plaintiff Scott is and has been, at all relevant times, a resident and citizen of Littleton, Connecticut. On or about April 22, 2024, Plaintiff received the Notice Letter directly from Defendant.

19.     Plaintiff Johnson is and has been, at all relevant times, a resident and citizen of Broomfield, Colorado. On or about April 22, 2024, Plaintiff received the Notice Letter directly from Defendant.

20.     Plaintiff Siebels is and has been, at all relevant times, a resident and citizen of St. Peters, Missouri. On or about April 22, 2024, Plaintiff received the Notice Letter directly from Defendant

21.     Defendant Asbury Automotive Group, Inc. is organized under the laws of Delaware but has its principal place of business at 2905 Premiere Parkway, Suite 300, Duluth, Georgia, 30097.

22.    Founded in 1995, Defendant is a corporation that owns 157 new vehicle dealerships across 15 states,[8] and at a given time has over 15,000 employees.

23.    Defendant offers new and used vehicles for sale, replacement parts, financing options, vehicle maintenance, and collision repair services and in 2022 alone had revenues of approximately $14.8 billion.[9]

24.    Defendant, who is "one of the largest automotive retail and service companies in the U.S., reported first quarter 2024 net income of $147 million" and "over 4 billion in revenue."[10]

## III.    JURISDICTION AND VENUE

25.    This Court has personal jurisdiction over Defendant because Defendant operates, conducts, engages in, or carries on a business in this State; as is evidenced by the fact that it maintains its principal places of business in Georgia; and committed tortious acts in Georgia.

26.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendant.

---

[8] https://investors.asburyauto.com/about-us.
[9] https://www.globaldata.com/company-profile/asbury-automotive-group-inc.
[10] https://investors.asburyauto.com/press-releases/20536.

27.    The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

28.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## IV.    FACTUAL ALLEGATIONS

**A.    Plaintiffs and the Class Members Entrusted their Private Information to Asbury**

29.    Plaintiffs and the Class Members are present, former, and prospective employees of Asbury.

30.    As a condition of employment, and/or of applying for employment with Asbury, Plaintiffs and the Class Members were required by Asbury to confide and make available to it their sensitive and confidential Private Information, including, but not limited to, their names and Social Security Numbers, and Driver's License numbers, and/or State Identification Numbers.

31.    Asbury maintains records of its employees' information such as their full names, Social Security Numbers, dates of birth, driver's license numbers, and financial account information in the ordinary course of business. These records are stored on Asbury's network systems.

32.    In its Privacy Policy, Asbury informs employees that it "takes privacy seriously and is committed to safeguarding your privacy."  Asbury states it "takes

commercially reasonable physical, electronic, and managerial measures to safeguard and secure any information [provided to Asbury] (e.g. data will be stored in protected databases on secured servers with restricted access.)."  The Privacy Policy is attached hereto as **Exhibit B.**

33.    Asbury represented to its employees that their Private Information would be secure.

34.    The Data Breach that is the subject of this civil action is not contemplated or permitted by Asbury's Privacy Policy.

35.    Asbury acquired, collected, and stored a massive amount of said Private Information of its employees, including Miller and the Members of the proposed Class, which it stored in its electronic systems.

36.    By obtaining, collecting, using, and deriving a benefit from its employees' Private Information, Asbury assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their Private Information from unauthorized disclosure.

37.    Plaintiffs have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs, as former employees, relied on Asbury to keep their Private Information confidential and securely maintained, to use this information for authorized purposes and disclosures only.

38.    In its Privacy Policy, Asbury promises that it will not sell Private Information to third parties for business or commercial purposes, and that it will disclose Private Information as described in the policy or in any other applicable privacy notices or opt-ins that website visitors may receive; that Asbury will disclose Private Information to third parties only with consent; to business partners or agents; for business transfers or assignments; and as required by law.[11]

39.    The Data Breach that is the subject of this civil action is not contemplated or permitted by Asbury's website Privacy Policy.

40.    Plaintiffs and the proposed Class Members entrusted their Private Information to Asbury solely for the purposes of applying for employment with Defendant and/or as a condition of employment, with the expectation and implied mutual understanding that Asbury would strictly maintain the confidentiality of the information and undertake adequate measures to safeguard it from theft or misuse.

41.    Plaintiffs and the proposed Class Members would not have entrusted Asbury with their highly sensitive Private Information if they had known that Asbury would fail to take adequate measures to protect it from unauthorized use or disclosure.

---

[11] *See id.*

B.    **The Data Breach**

42.    Around December 23, 2023, Defendant was attacked by the notorious cyber gang Cactus Ransomware Group, which targets multi-billion-dollar businesses, like Defendant.[12]

43.    Apparently before Defendant even noticed that its information systems had been breached, the attackers had time to perform reconnaissance of Defendant's digital assets, identity documents containing Plaintiff's and Class Members PII, and exfiltrate that data.

44.    Had Defendant implemented industry standard logging, monitoring, and alerting procedures and technology, Defendant could have prevented this exfiltration.

45.    Instead, the Cactus Ransomware group was able to steal valuable data, including social security numbers, which it then at least partially posted on the dark web via its leak site,[13] which is where such cyber gangs often post sample data after their targets refuse to timely pay the ransom:

---

[12] Hamza Tarq, *Fortune 500 Company Among the Latest Victims of the Cactus Ransomware Group* (Jan. 16, 2024), https://techlapse.com/news/asbury-automotive-hacked-by-ransomware-group.
[13] *Id.*



46.    In all, Cactus is believed to have stolen at least 62 GB of data that is selected from Defendant's information systems.[14]

47.     Notwithstanding that Defendant only notified Plaintiff that his name and social security number were impacted, the Data Breach reportedly affected individuals' names, social security numbers, passport information, photos of driver's licenses, private financial information, employee data, and more.[15]

48.    Though Defendant has not explained the source of the attack, or the root cause, it is likely that Defendant's cybersecurity program is woefully inadequate

---

[14] *Id.*
[15] *Id.*

and could have prevented or significantly limited the attack if its cybersecurity program had met industry standards.

49.     Indeed, Defendant apparently did not even realize it was being attacked, until the attackers had completed their mission, which provides a strong indication that Defendant had failed to implement standard logging, monitoring, and alerting systems, such as data loss prevention tools, endpoint detection and response tools, and/or a security information and event management platform.

50.     Moreover, Defendant apparently lacked diligence in hardening its environment from outside attacks. According to UpGuard, as of July 2024, Defendant had a C rating of 523 out of 950 even just for its external facing services.[16]

## C.     Defendant Holds Itself Out as a Trusted Partner

51.     Notwithstanding its failure to implement reasonable, industry standard cybersecurity safeguards, Defendant holds itself out as a trusted partner. For example, its stated mission "is to have our guests view us as trusted, high-integrity professionals who consistently deliver an exceptional experience and genuinely care about their needs."[17]

---

[16] https://www.upguard.com/security-report/asburyauto.
[17] https://socialresponsibility.asburyauto.com/community.

52.    Defendant represents that it maintains a "culture of security" and "is committed to protecting the confidential information of our company, guests, team members, and other stakeholders."[18]

53.    To that end, Defendant notes that it has "an established Information Security Program which is overseen by the Information Security Committee (ISC)," who "routinely reviews the company's information security and technology risk profile."[19]

54.    This cybersecurity program apparently includes an incident response plan, security auditing, and team member training.[20]

55.    Tellingly, Defendant's website included none of this information before the Breach, and likely did not exist at that time.[21]

**D.    This Data Breach was Foreseeable by Defendant**

56.    Defendant tortiously failed to take the necessary precautions required to safeguard and protect the PII of Plaintiff and the Class Members from unauthorized disclosure. Defendant's actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21]    Asbury Automotive, *Community*, WAYBACKMACHINE (Feb. 2, 2024, archive), https://web.archive.org/web/20240223174051/https://socialresponsibility.asburyauto.com/community; Asbury Automotive, *Community*, WAYBACKMACHINE, (April 18, 2023, archive), https://web.archive.org/web/20230418182312/https://socialresponsibility.asburyauto.com/community.

57.     Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing PII and the critical importance of providing adequate security for that information.

58.     Cyber-attacks against companies such as Defendant are targeted and frequent. According to Forbes, there were at least 2,365 cyber-attacks in 2023 with 343,338,964 victims, with phishing attacks listed as one of the most common types.[22]

59.     According to the Identity Theft Resource Center, the emotional toll of identity crimes is expected to continue to increase such that "assistance providers will struggle to meet the emotional recovery needs of victims." Indeed, the report notes that "[i]dentity crime victimization is too often classified as not creating trauma for which a victim would require support, despite the fact that our latest *Consumer Impact Report* had 16 percent (16%) of respondents state they contemplated suicide as a result of victimization."[23]

60.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone bothering to pay attention. According to

---

[22] Mariah St. John, *Cybersecurity Stats: Facts and Figures You Should Know*, FORBES ADVISOR (Feb. 28, 2024, 2:33 PM), https://www.forbes.com/advisor/education/it-and-tech/cybersecurity-statistics.
[23] Identity Theft Resource Center, *2024 Predictions*, https://www.idtheftcenter.org/identity-theft-resource-center-2024-predictions (last accessed July 11, 2024).

IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[24]

61.    PII is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, sale on the dark web, extortion, financial fraud, and identity theft. Indeed, at least a portion of the stolen data was already posted to the dark web by Cactus, the cyber gang that stole the data.

62.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name, social security number, and financial records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

63.    Given the nature of the data collected, and the fact that data breaches are a well-known threat to all companies that store such information, Defendant was on notice of the harms associated with its failure to implement reasonable, industry standard cybersecurity safeguards.

## E.    Defendant Failed to Comply with FTC Guidelines and other Industry Standards

---

[24] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond,* https://www.ibm.com/reports/data-breach (last accessed July 11, 2024).

64.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

65.     In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[25]

66.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for

---

[25] *See* Federal Trade Comm'n, *Protecting Private Information: A Guide for Business* (October 2016), https://www.bulkorder.ftc.gov/system/files/publications/2_900006_716a_ protectingpersinfo-508.pdf.

security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[26]

67.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.    These FTC enforcement actions include actions against entities failing to safeguard PII such as Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

69.    Defendant failed to properly implement basic data security practices widely known throughout the industry. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer PII

---

[26] *See id.*

constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

70.    Defendant was always fully aware of its obligations to protect the PII of Plaintiff and the Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so.

71.    For example, the FTC notes that companies should maintain central log files, monitor incoming traffic for signs of malicious attempts and activity, and monitoring outgoing traffic to identify signs of data exfiltration.[27] If Defendant had these controls in place, it would have realized that cybercriminals had infiltrated its systems, were performing reconnaissance to identify valuable data, and it likely would have realized that the data was being exfiltrated before it was too late.

72.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

73.    The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account

---

[27] *Id.* at 21–22.

Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[28]

74.    In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in

---

[28]    *See* Rapid7, *CIS Top 18 Critical Security Controls Solutions,* https://www.rapid7.com/solutions/compliance/critical-controls (last accessed July 11, 2024).

addition to their crucial role in the workplace.[29]

75.     Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (1) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (2) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (3) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[30]

---

[29] Federal Trade Comm'n, *Understanding the NIST Cybersecurity Framework*, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last accessed July 11, 2024).

[30] Cybersecurity & Infrastructure Security Agency, *Shields Up: Guidance for Organizations*, https://www.cisa.gov/shields-guidance-organizations (last accessed July 11, 2024).

76.     Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and the proposed Class Members' PII, resulting in the Data Breach.

**F.     The Data Breach Caused Plaintiffs and the Class Members Injury and Damages**

77.     Plaintiffs and members of the proposed Class have suffered injury and damages from the misuse of their PII that can be directly traced to Defendant, that has occurred, is ongoing, and/or imminently will occur.

78.     As stated above unauthorized cybercriminals stole Plaintiffs' and the proposed Class Members' PII, including their social security numbers and other financial and identification information, which has now at least in part been published to the dark web.

79.     The ramifications of Defendant's failure to keep Plaintiffs' and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number,

social security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

80.    Because Defendant failed to prevent the Data Breach, Plaintiffs and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the Class Members have suffered, will imminently suffer, or are at an increased risk of suffering:

a.    Fraudulent misuse of PII;

b.    Monetary harm in the form of being forced to spend their own valuable time responding to Defendant's failures, including by reviewing their accounts for fraudulent activity and changing financial account information;

c.    The loss of the opportunity to control how PII is used;

d.    The compromise and continuing publication of their PII;

e.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f.    Delay in receipt of tax refund monies;

g.    Increase in spam texts and telephone calls;

h.    Unauthorized use of stolen PII; and

i.    The continued risk to their PII, which remains in the possession

of Defendant's possession and control and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in their possession.

81.    Furthermore, the Data Breach has placed Plaintiffs and the proposed Class Members at an increased risk of fraud and identity theft.

82.    Just like Defendant's instructions, the FTC recommends that identity theft victims spend their time and effort on intensive and/or costly tasks designed to help protect their personal and financial information after a data breach, including contacting the company where the fraud occurred and asking them to close or freeze accounts and changing login information; contacting one of the credit bureaus to place a fraud alert on credit files (consider an extended fraud alert that lasts for 7 years if someone steals their identity); reviewing their credit reports; seeking a credit freeze; correcting their credit reports; and other steps such as contacting law enforcement and reporting the identity theft to the FTC.[31]

83.    Identity thieves use stolen PII such as social security numbers, which were stolen here, for a variety of crimes, including credit card fraud phone or utilities fraud, and bank/finance fraud.

84.    Identity thieves can also use social security numbers to obtain a driver's license or official identification card in the victim's name (to the extent not already

---

[31] *See* Federal Trade Comm'n, https://www.identitytheft.gov/Steps (last accessed July 11, 2024).

stolen in the Data breach) but with the thief's picture; use the victim's name and social security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

85.    In addition, identity thieves may obtain a job using the victim's social security number, rent a house or receive other services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

86.    Moreover, the emotional trauma, stress, and anxiety suffered by Data Breach victims is severe. The fear for the financial future because they are helpless to prevent such harm on their own, some develop eating disorders, and in some cases the emotion toll manifests as post-traumatic stress disorder. Indeed, it is not uncommon for the stress and anxiety created by a data breach to result in physical harm in the form of sleep deprivation. "Being a cybercrime victim can become a vicious cycle. You might be unable to get a full night's sleep because you're worried about your situation. This sleeplessness is due to higher levels of the stress hormones cortisol and adrenaline."[32]

---

[32] Stanley Clark, *The Psychological Impact on the Lives of Cyber-Attack Victims*, PAINTED BRAIN (Aug. 27, 2023), https://paintedbrain.org/painted-brain-media/blogs/the-psychological-impact-on-the-lives-of-cyber-attack-victims.

87.    Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. 35% reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage.  54% percent reported feelings of being violated. [33]

88.    It must also be noted there may be a substantial time lag–measured in years–between when breach occurs and when identity theft and financial fraud occurs. Though some victims see immediate fraud on their accounts, others do not because cybercriminals often wait until the victims' credit monitoring service expires to perpetrate their financial crimes.

89.    "For the individual who is a victim of stolen data, this can often lead to headaches: changing passwords frequently, enacting credit freezes or identity monitoring, and so on."[34]

---

[33] Jason Steele, *Credit Card and ID Theft Statistics*, CREDITCARDS.COM (June 11, 2021), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276 (citing Identity Theft Resource Center, *2021 Consumer Aftermath Report* (May 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims).
[34] Center for Internet Security, *How You're Affected by Data Breaches*, https://www.cisecurity.org/insights/blog/how-youre-affected-by-data-breaches (last accessed July 11, 2024).

90.    PII are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. This is especially the case here given that the data has at least partially been posted to the dark web already.

91.    Social security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[35]

92.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[36] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the

---

[35] *See* U.S. Social Security Administration, *Identity Theft and Your Social Security Number*, Publication No. 05-10064 (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[36] *See id.*

individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

93.    Moreover, it is not an easy task to change or cancel a stolen social security number. An individual cannot obtain a new social security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[37]

94.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[38]

95.    Accordingly, the Data Breach has caused Plaintiffs and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the unauthorized disclosure,

---

[37] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[38] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

96.    Defendant knew or should have known of these harms which would be caused by the Data Breach that they permitted to occur and strengthened their data systems accordingly.

## G.    Plaintiffs' Experiences

### *Plaintiff Evan Miller's Experience*

97.    Plaintiff Evan Miller is a former employee of Defendant.

98.    As a condition of his employment, Plaintiff Miller was required to provide his Private Information to Defendant, including his name, address, contact information, Social Security Number, and other sensitive information. Evan Miller recalls signing Defendant's Privacy Policy, at the outset of his employment, wherein Asbury promised to maintain the confidentiality of Private Information.  Plaintiff Miller recalls undergoing training related to Defendant's Privacy Policies.

99.    At the time of the Data Breach, Defendant retained Plaintiff's Private information in its system, despite Plaintiff not being an employee for over three years.

100.    Plaintiff is very careful about sharing his sensitive Private information. He does not provide his Private Information to anyone unless it is necessary. Plaintiff does not give out his personal contact information. Plaintiff also stores any

documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information.

101.    Plaintiff received the Notice Letter directly from Defendant on or about April 22, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his name; demographic information such as address and contact information; and Social Security Number.

102.    As a result of the Data Breach and the resulting suspicious activity, Plaintiff Miller made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching and verifying the legitimacy of the Data Breach as well as monitoring his financial account for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and recreation.

103.    Plaintiff Miller suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the

actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

104.    Additionally, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

105.    As a result of the Data Breach, Plaintiff Miller suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes

of identity theft and fraud. Plaintiff Miller is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

106.   As a result of the Data Breach, Plaintiff Miller anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

107.   As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

108.   Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Omar Aviles' Experience*

109.   Plaintiff Omar Sanchez Aviles is a current employee of Defendant.

110.   As a condition of his employment, Plaintiff Aviles was required to provide his Private Information to Defendant, including his name, address, contact information, Social Security Number, and other sensitive information.

111.   At the time of the Data Breach, Defendant retained Plaintiff's Private information in its system.

112.   Plaintiff is very careful about sharing his sensitive Private information. He does not provide his Private Information to anyone unless it is necessary. Plaintiff

does not give out his personal contact information. Plaintiff also stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information.

113.    Plaintiff received the Notice Letter directly from Defendant on or about April 22, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his name; demographic information such as address and contact information; and Social Security Number.

114.    As a result of the Data Breach and the resulting suspicious activity, Plaintiff Aviles made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching and verifying the legitimacy of the Data Breach as well as monitoring his financial account for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and recreation.

115. Plaintiff Aviles suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit

of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

116.    Additionally, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

117.    As a result of the Data Breach, Plaintiff Aviles suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about

unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud. Plaintiff Aviles is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

118.  As a result of the Data Breach, Plaintiff Aviles anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

119.  As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

120.  Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff David Pedraza's Experience*

121.  Plaintiff David Pedraza is a former employee of Defendant.

122.  As a condition of his employment, Plaintiff Pedraza was required to provide his Private Information to Defendant, including his name, address, contact information, Social Security Number, and other sensitive information.

123.  At the time of the Data Breach, Defendant retained Plaintiff's Private information in its system, despite Plaintiff not being an employee for over a year.

124.   Plaintiff is very careful about sharing his sensitive Private information. He does not provide his Private Information to anyone unless it is necessary. Plaintiff does not give out his personal contact information. Plaintiff also stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information.

125.   Plaintiff received the Notice Letter directly from Defendant on or about April 22, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his name; demographic information such as address and contact information; and Social Security Number.

126.   As a result of the Data Breach and the resulting suspicious activity, Plaintiff Pedraza made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching and verifying the legitimacy of the Data Breach as well as monitoring his financial account for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and recreation.

127.  Plaintiff Pedraza suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished

value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

128. Additionally, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

129.    As a result of the Data Breach, Plaintiff Pedraza suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud. Plaintiff Pedraza is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

130.    As a result of the Data Breach, Plaintiff Pedraza anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

131.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

132.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Christian Scott's Experience*

133.    Plaintiff Christian D. Scott is a former employee of Defendant.

134.    As a condition of his employment, Plaintiff Scott was required to provide his Private Information to Defendant, including his name, address, contact information, Social Security Number, and other sensitive information.

135.    At the time of the Data Breach, Defendant retained Plaintiff's Private information in its system, despite Plaintiff not being an employee for six months.

136.    Plaintiff is very careful about sharing his sensitive Private information. He does not provide his Private Information to anyone unless it is necessary. Plaintiff does not give out his personal contact information. Plaintiff also stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information.

137.    Plaintiff received the Notice Letter directly from Defendant on or about April 22, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his name; demographic information such as address and contact information; and Social Security Number.

138.    As a result of the Data Breach and the resulting suspicious activity, Plaintiff Scott made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching and verifying the legitimacy of the Data Breach as well as monitoring his financial account for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and recreation.

139.    Plaintiff Scott suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

140.    Additionally, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam

emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

141.  As a result of the Data Breach, Plaintiff Scott suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud.  Plaintiff Scott is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

142.  As a result of the Data Breach, Plaintiff Scott anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

143.  As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

144.  Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Stephen Johnson's Experience***

145.  Plaintiff Stephen Johnson is a former employee of Defendant.

146.   As a condition of his employment, Plaintiff Johnson was required to provide his Private Information to Defendant, including his name, address, contact information, Social Security Number, and other sensitive information.

147.   At the time of the Data Breach, Defendant retained Plaintiff's Private information in its system.

148.   Plaintiff is very careful about sharing his sensitive Private information. He does not provide his Private Information to anyone unless it is necessary. Plaintiff does not give out his personal contact information. Plaintiff also stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information.

149.   Plaintiff received the Notice Letter directly from Defendant on or about April 22, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his name; demographic information such as address and contact information; and Social Security Number.

150.   As a result of the Data Breach and the resulting suspicious activity, Plaintiff Johnson made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching and verifying the legitimacy of the Data Breach as well as monitoring his financial account for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on

activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and recreation.

151.    Plaintiff Johnson suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

152.    Additionally, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available

sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

153.   As a result of the Data Breach, Plaintiff Johnson suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud. Plaintiff Johnson is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

154.   As a result of the Data Breach, Plaintiff Johnson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

155.   As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

156.   Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Brendan Siebels' Experience*

157.   Plaintiff Brendan Scott Siebels is a former employee of Defendant.

158.   As a condition of his employment, Plaintiff Siebels was required to provide his Private Information to Defendant, including his name, address, contact information, Social Security Number, and other sensitive information.

159.   At the time of the Data Breach, Defendant retained Plaintiff's Private information in its system, despite Plaintiff not being an employee for over nine months.

160.   Plaintiff is very careful about sharing his sensitive Private information. He does not provide his Private Information to anyone unless it is necessary. Plaintiff does not give out his personal contact information. Plaintiff also stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information.

161.   Plaintiff received the Notice Letter directly from Defendant on or about April 22, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his name; demographic information such as address and contact information; and Social Security Number.

162.   As a result of the Data Breach and the resulting suspicious activity, Plaintiff Siebels made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching and verifying the legitimacy of the Data

Breach as well as monitoring his financial account for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and recreation.

163.   Plaintiff Siebels suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

164.   Additionally, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the

information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

165.    As a result of the Data Breach, Plaintiff Siebels suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud.  Plaintiff Siebels is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

166.    As a result of the Data Breach, Plaintiff Siebels anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

167.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

168. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

169. Plaintiffs bring this nationwide class action individually and on behalf of all other persons similarly situated pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 23(b)(3).

170. Plaintiffs propose the following Class definition ("Nationwide Class"), subject to amendment based on information obtained through discovery:

> **All persons whose PII was compromised because of the Data Breach experienced by Defendant beginning on or about December 25, 2023.**

171. Though Defendant has admitted only that current and former employees were affected (and possibly candidates that were not employed) by the Data Breach, Defendant has not explained the areas of its systems that the attacker had access to, so it is entirely possible that the Class will include consumers who information Defendant stores and maintains as part of its maintenance and sales of vehicles, among other services. Thus, Plaintiffs reserve the right to amend the proposed class definition.

172. Excluded from the Class are Defendant's members, officers, directors, and employees; any entity in which Defendant has a controlling interest; and the

affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

173. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

174. This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(a)(1)-(3) and Fed. R. Civ. P. 23(b)(2), including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

175. **Numerosity, Fed. R. Civ. P. 23(a)(1):** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the PII of approximately 15,000 individuals was compromised in the Data Breach. Such information is readily ascertainable from Defendant's records.

176. **Commonality, Fed. R. Civ. Proc. 23(a)(2), and Predominance, Fed. R. Civ. Proc. 23(b)(3):** There are numerous questions of law and fact common to the Class. As such, there is a well-defined community of interest among the Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally

applicable to the Class. Such common legal or factual questions include, but are not limited to:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

d.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, the FTC Act;

e.    Whether computer hackers obtained Plaintiffs' and Class Members' PII in the Data Breach;

f.    Whether Defendant knew or should have known that their data security systems and monitoring processes were deficient;

g.    Whether Defendant failed to adequately respond to the Data Breach, including failing to timely notify the Plaintiffs and the Class Members;

h.    Whether Defendant's failures amounted to negligence;

i.    Whether Defendant's failures amounted to negligence per se;

j.    Whether Defendant breached their contractual promises;

k.    Whether Defendant were unjustly enriched;

l.    Whether Plaintiffs and the Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

m.    Whether Defendant's acts violated the law, and;

n.    Whether Plaintiffs and the Class Members are entitled to damages including compensatory and punitive damages, and/or injunctive relief.

177.    **Typicality, Fed. R. Civ. P. 23(a)(3):** The claims or defenses of Plaintiffs are typical of the claims or defenses of the proposed Class because Plaintiffs' claims are based upon the same legal theories and same violations of law. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach, and all arise from the same set of facts regarding Defendant's failures:

a.    to protect Plaintiffs' and Class Members' PII;

b.    to discover and remediate the Breach of its computer systems more quickly; and

c.    to disclose to Plaintiffs and Class Members in a complete and timely manner information concerning the security breach and the theft of their Private Information.

178.  **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

179.  **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is a superior method for the fair and efficient adjudication of this controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, and joinder of the Class Members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

  a.  It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions. Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which in any event might cause inconsistent results.

  b.  When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendant to all Class Members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding

rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

c. A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions. If Class Members are forced to bring individual suits, the transactional costs, including those incurred by Defendant, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and the same legal issues. A class action will promote a global resolution and will promote uniformity of relief as to the Class Members and as to Defendant.

d. This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only Defendant's client's customers, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendant's records, such that direct notice to the Class Members would be appropriate.

180.   **Injunctive and Declaratory Relief, Fed. R. Civ. Proc. 23(b)(2):** In addition, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

181.   Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

### COUNT I
### NEGLIGENCE
### On Behalf of Plaintiffs and the Class

182.   Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 181 above as if fully set forth herein.

183.   Defendant Asbury owed a duty to Plaintiffs and the Members of the Class to exercise reasonable care to safeguard their Private Information in its possession, based on the foreseeable risk of a data breach and the resulting exposure of their information, as well as on account of the special relationship between Defendant and its employees, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and the unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

184.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Members of the Class's Private Information by disclosing and providing access to this information to third parties and by failing to properly supervise both the manner in which the information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

185.    Further, Defendant owed to Plaintiffs and Members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their Private Information. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and Members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and Members of the Class to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

186.    Asbury owed these duties to Plaintiffs and Members of the Class because they are Members of a well-defined, foreseeable, and probable class of individuals who Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiffs' and Members of the Class's personal information and PII for employment.

187.   Plaintiffs and Members of the Class were required to provide their Private Information to Defendant as a condition of applying for employment and/or as a condition of employment, and Defendant retained that information.

188.   The risk that unauthorized persons would attempt to gain access to Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of this information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information, whether by hacking attack, or otherwise.

189.   Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Members of the Class, and the importance of exercising reasonable care in handling it.

190.   Defendant Asbury breached its duties by failing to exercise reasonable care in supervising its employees and agents, and in handling and securing the Private Information of Plaintiffs and Members of the Class which actually and proximately caused the Data Breach and Plaintiffs' and Members of the Class's injuries. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Members of the Class's injuries-in-fact.

191.   As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Members of the Class have suffered or will suffer injury and damages, including misuse and fraudulent activity, monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

192.   Defendant's breach of its common law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

193.   Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 181 above as if fully set forth herein.

194.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class Members' Private Information.

195.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, employees' and prospective employees' Private Information.

196.    The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the Class Members' sensitive Private Information.

197.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect its employees' and prospective employees' Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had required and solicited, collected, and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to employees in the event of a breach, which ultimately came to pass.

59

198.   The harm that has occurred in the Data Breach is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class Members.

199.   Defendant had a duty to Plaintiffs and the Class Members to implement and maintain reasonable security procedures and practices to safeguard their Private Information.

200.   Defendant breached its respective duties to Plaintiffs and Members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class Members' Private Information.

201.   Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

202.   But-for Asbury's wrongful and negligent breach of its duties owed to Plaintiffs and the Class, Plaintiffs and the Members of the Class would not have been injured.

203.   The injury and harm suffered by Plaintiffs and the Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its

breach would cause Plaintiffs and Members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

204.   Had Plaintiffs and Members of the Class known that Defendant did not adequately protect employees' and prospective employees' Private Information, Plaintiffs and Members of the Class would not have entrusted Defendant with their Private Information.

205.   As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered harm, injury, and damages, as set forth in the preceding paragraphs.

**COUNT III**
**BREACH OF EXPRESS CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

206.   Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 181 above as if fully set forth herein.

207.   Plaintiffs and Class members entered into written agreements with Asbury regarding their employment. This agreement included, *inter alia*, Asbury's Privacy Policy.

208.   Plaintiffs and Class members were required to provide their Private Information, including full names, Social Security Numbers, dates of birth, driver's license numbers, and financial account information to Asbury as a condition of

employment. Plaintiffs and Class members signed Privacy Policies wherein Asbury acknowledged that it was required to keep employee information confidential.

209.   Asbury, therefore, offered Plaintiffs and the Class a unilateral contract, which Plaintiffs and the Class members accepted by providing the necessary Private Information and obtaining employment.

210.   Plaintiff's and the Class members' decision to obtain employment from Asbury while under no obligation to do so constituted both consideration for and acceptance of Asbury's offer.

211.   Implicit in the agreement between Asbury and the Class was the obligation that both parties to the agreement would maintain information confidentially and securely.

212.   Additionally, Asbury expressly promised to protect the Private Information entrusted to it and to make disclosures only if permitted by law, permitted by Asbury privacy disclosures, or if made with the employee's express authorization.

213.   Asbury also promised to disclose the Private Information entrusted to it to authorized individuals only.

214.   Implicit in performing these contractual duties is an obligation for Asbury to reasonably safeguard its systems and data against cyberattack, including

ransomware attacks and data breaches like the Data Breach in this instance which can cause and have caused harm and injury to Plaintiffs and the Class members.

215.   Additionally, Asbury's Notice of Privacy Practices contained additional covenants restricting its disclosure of Private Information.

216.   Plaintiffs and Class members fully performed as required under the agreement, Asbury did not.

217.   Asbury violated the terms of the agreement by allowing unauthorized access to Plaintiff's and the other Class members' Private Information for unauthorized purposes without first obtaining Plaintiff's or the other Class members' consent and without encrypting or otherwise protecting the Private Information in a form which could not reasonably be used to identify, target, extract, or publish the Private Information.

218.   Asbury further violated the terms of the agreement by allowing cybercriminals to encrypt and extract Class members' Private Information and to publish the stolen Private Information on the dark web.

219.   Asbury materially breached the agreement when it exposed Plaintiff's and the Class members' Private Information during the Data Breach, thereby depriving Plaintiffs and Class members of the full benefit of their bargain.

220.   Plaintiffs and Class members would not have produced their Private Information to Asbury if they knew that Asbury would not adequately safeguard it

as promised and would allow cybercriminals to extract it and publish it on the dark web.

221.    Asbury breached its agreement with Plaintiffs and Class members by failing to safeguard its systems and data from the Data Breach reasonably.

222.    Asbury violated the terms of the contract by failing to take appropriate measures to protect Plaintiff's and the other Class members' Private Information in accordance with its promises and representations.

223.    Asbury violated the agreement by failing to comply with applicable laws regarding the access, correction, and/or deletion of Private Information, and notification to affected persons.

224.    Plaintiffs and Class members have been injured as a result of Asbury's breach of contract and are therefore entitled to damages

225.    As a result of Asbury's unlawful misconduct and breach of its contract with Plaintiffs and the Class members, Plaintiffs and the Class members have suffered additional pecuniary loss and injury-in-fact, including without limitation the improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach, from which subsequent injury-in-fact and damages are ongoing, imminent, and immediate.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

226.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 181 above as if fully set forth herein.

227.    Plaintiffs plead this claim in the alternative to Plaintiffs' breach of express contract claim.

228.    Defendant offered to provide employment to Plaintiffs and Members of the Class in exchange for payment.

229.    Asbury also required Plaintiff and the Members of the Class to provide Defendant with their Private Information as a condition of applying for employment, and for employees as a condition of receiving renumeration for labor rendered.

230.    In turn, and through its Privacy Policy, Defendant agreed it would not disclose Private Information it collects to unauthorized persons. Defendant also promised to maintain safeguards to protect their Private Information.

231.    Plaintiff and the Members of the Class accepted Defendant's offer by providing Private Information to Asbury, in applying for employment, and providing labor to Defendant and receiving renumeration.

232.    The agreement was supported by adequate consideration, as it was an exchange of labor for money.

233.   Implicit in the Parties' agreement was that Defendant would provide Plaintiff and Members of the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their Private Information.

234.   Plaintiff and the Members of the Class would not have entrusted their Private Information to Defendant in the absence of such agreement with Defendant.

235.   Asbury materially breached the contract(s) it had entered with Plaintiff and Members of the Class by failing to safeguard such Private Information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant further breached the implied contracts with Plaintiff and Members of the Class by:

a. Failing to properly safeguard and protect Plaintiff' and Members of the Class's Private Information;

b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

c. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendant received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

236.   The damages sustained by Plaintiff and Members of the Class as set forth in the preceding paragraphs were the direct and proximate result of Defendant's material breaches of its agreement(s).

237.   Plaintiff and Members of the Class have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant.

238.   Every contract in Georgia has an implied covenant of good faith and fair dealing.

239.   Defendant's Privacy Policy promises that it "takes your privacy seriously and is committed to safeguarding your privacy [Defendant" will take commercially reasonable physical, electronic and managerial measures to safeguard and secure any information you provide to us (e.g. data will be stored in protected databases on secured servers with restricted access).").

240.   Plaintiffs and Class members have complied with and performed all conditions of their contracts with Defendant.

241.   Defendant breached the implied covenant of good faith and fair dealing by failing to maintain commercially reasonable and adequate computer measures, systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

242.   Defendant accepted Plaintiffs' and Class members' Private Information and other personal information after Defendant knew, or should have known, of the security vulnerabilities of its systems that were not commercially reasonable, and after Defendant's data systems were exploited in the Data Breach. Further,

Defendant failed to timely and accurately disclose the Data Breach to Plaintiff and Class Members.

243.   Defendant acted in bad faith and/or with malicious motive in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

244.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the

lives of Plaintiffs and Class Members; (vii) anxiety, emotional distress, loss of privacy, and (ix) other economic and noneconomic losses.

245.    Defendant failed to advise Plaintiff and Members of the Class of the Data Breach promptly and sufficiently.

246.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

247.    Plaintiff and Members of the Class have sustained damages as a result of Defendant's breaches of its agreement, including breaches thereof through violations of the covenant of good faith and fair dealing.

## COUNT V
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

248.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 181 above as if fully set forth herein.

249.    Plaintiffs bring this claim in the alternative to the claim for breach of implied contract.

250.    Plaintiffs and Class Members conferred a monetary benefit to Defendant in the form of providing their Private Information to Defendant and by Defendant's retention and use that information. Defendant understood that it was in fact so benefitted.

251.   Defendant also understood and appreciated that Plaintiffs' and Class members' Private Information was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

252.   Defendant knew and appreciated that Plaintiffs and Class Members conferred a benefit on Defendant, and Defendant accepted and retained that benefit. Defendant profited from this benefit, as the transmission of Private Information to Defendant from Plaintiffs and Class Members is an integral part of Defendant's business. Without collecting and maintaining Plaintiffs' and Class Members' Private Information, Defendant would not be able to perform its services.

253.   Defendant was obligated to provide adequate security to the Private Information belonging to Plaintiffs and Class Members, including by paying for costs of and implementing sufficient data management and security program, procedures, and policies.

254.   Defendant should not be permitted to retain any benefit belonging to Plaintiffs and Class Members because Defendant failed to implement necessary security measures to protect the Plaintiffs' and Class Members' Private Information.

255.   Defendant gained access to the Plaintiffs' and Class Members' Private Information through inequitable means as Defendant failed to disclose that it had inadequate security measures and practices.

256.    Plaintiffs and Class Members were unaware of Defendant's inadequate security measures and would not have entrusted their Private Information to Defendant had they known of the inadequate security measures and practices.

257.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

258.    Defendant was also enriched from the value of Plaintiffs' and Class Members' Private Information. Private Information has independent value as a form of intangible property. Defendant also derives value from this information because it allows Defendant to operate its business and generate revenue.

259.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant avoided its data security obligations at the expense of Plaintiffs and Class Members by failing to implement and/or utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

260.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

261.   To the extent that this cause of action is pleaded in the alternative to the others, Plaintiffs and Class Members have no adequate remedy at law.

262.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; (vii) anxiety, emotional distress, loss of privacy, and (ix) other economic and noneconomic losses.

263.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, Evan Miller, Omar Aviles, David Pedraza, Christian D. Scott, Stephen Johnson, and Brendan Siebels, individually and on behalf of all others similarly situated, the Class as heretofore identified, respectfully pray this Honorable Court for judgment as follows:

A.    Certification for this matter to proceed as a class action on behalf of the proposed Class under Fed. R. Civ. Proc. 23;

B.    Designation of Plaintiffs as Class Representatives and designation of the undersigned as Class Counsel;

C.    Actual damages in an amount according to proof;

D.    Injunctive or declaratory relief;

E.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

F.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

G.    For attorneys' fees under the common fund doctrine and all other

applicable law; and

H.     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individuals and on behalf of the Class, hereby demand a trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable.

Dated:  September 23, 2024                    Respectfully submitted,

*/s/ Lynn A. Toops*
Lynn A. Toops (No. 26386-49)
Amina A. Thomas (34451-49)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
athomas@cohenandmalad.com

Joseph B. Alonso
Georgia Bar No. 13627
**GREGORY, DOYLE, CALHOUN & ROGERS, LLC**
49 Atlanta Street
Marietta, GA 30060
Tel: (770) 422-1776
jalonso@gdcrlaw.com

***Counsel for Plaintiff Miller***

Samuel J. Strauss*
Raina C. Borrelli*
STRAUSS BORRELLI PLLC

One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*Counsel for Plaintiff Aviles*

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 789-4462
klaukaitis@laukaitislaw.com

*Counsel for Plaintiff Pedraza*

Daniel O. Herrera*
Nickolas J. Hagman*
Mohammed A. Rathur*
**CAFFERTY CLOBES
MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com
mrathur@caffertyclobes.com

*Counsel for Plaintiff Scott*

David K. Lietz
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

MaryBeth V. Gibson
GA Bar no. 725843
**Gibson Consumer Law Group, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA 30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

*Counsel for Plaintiff Johnson*

J. Gerard Stranch, IV (BPR 23045)
Grayson Wells (BPR 039658)
**Stranch, Jennings & Garvey, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

*Counsel for Plaintiff Siebels*

* Pro Hac Vice forthcoming